# DECLARATION OF TASK FORCE OFFICER SHELBY E. SMITH

Pursuant to 28 U.S.C. § 1746 and the laws of the United States, I, Shelby E. Smith, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief:

1. I am a Detective with the Nash County Sheriff's Office (NCSO) and a Task Force Officer (TFO) of the Department of Homeland Security (DHS), Homeland Security Investigations (HSI), assigned to the Cary, North Carolina office. I have been employed by the NCSO since June of 2018 and assigned as a HSI TFO since August of 2021. Since May 2021, I have been the co-case agent assigned to investigating members of a contraband cigarette smuggling organization operating in the Eastern District of North Carolina. As part of my duties, I have executed criminal search warrants and other law enforcement processes resulting in the seizure of United States currency, narcotics, trafficked cigarettes, fraudulent identifications, cellular devices, etc.

2. This declaration is based on my own knowledge and experience as well as information provided by other federal, state, and/or local law enforcement agencies.

3. This Declaration is made in support of the forfeiture of $41,691.00 in United States Currency seized from Fares Albahr on May 13, 2022, in the Eastern District of North Carolina. The U.S. currency is forfeitable pursuant to Title 18, U.S.C., Section 981(a)(1)(C), as it constitutes or is derived from proceeds traceable to specified unlawful activity, as defined in Title 18, U.S.C., Section 1957(c)(7), including the trafficking of contraband cigarettes in violation of Title 18, U.S.C., Section 2342.

4. I know from my knowledge, training and experience that state and local governments are empowered to impose excise taxes on the distribution of tobacco, including cigarettes. Cigarette excise taxes vary greatly by state. For example, the state excise tax imposed by North Carolina is $4.50 per carton. By comparison, in New York City, the combined state and local excise tax is $58.50 per carton. This nearly $54.00 difference per carton provides an incentive for individuals and criminal organization to traffic contraband cigarettes from North Carolina to New York for sale.

5. Your affiant and members of the Nash County Sheriff's Office possess knowledge, training, and experience as it relates to tobacco smuggling operations. Both agencies are also members of a vast network of interdiction officers that specialize in tobacco smuggling including common themes, patterns, trends, and methodologies which are often broadcasted throughout this network to ensure interdiction officers are made aware of the same. Below are some common items or smuggling methods often encountered:

   a. Use of Rental Vehicles -- Cigarette traffickers commonly use rental vehicles to avoid wear and tear on their own vehicles due to the high number of miles driven.

GOVERNMENT EXHIBIT A

The use of rental vehicles also allows traffickers to change vehicles periodically, avoiding monitoring by License Plate Readers (LPRs). Cigarette traffickers typically rent large vehicles like SUVs, minivans, cargo vans, pickup trucks, and box trucks which are capable of carrying large quantities of cigarettes per trip. One of these vehicles can carry as many as 1,200 cartons of cigarettes.

b. Use of Blankets, Sheets, and Tarps -- Cigarette traffickers repeatedly employ the same methods to hide the contraband cigarettes from view during transportation. For example, traffickers commonly attach an after-market cap or bed cover to conceal cigarettes loaded in the truck bed; or fold down the rear seats of an SUV or minivan to permit cigarettes to be stacked below the windows. Traffickers also commonly carry bedding (particularly, dark in color bed sheets and/or blankets) to cover the load of cigarettes during transportation. These practices are used to conceal contraband to avoid detection by law enforcement.

c. Presence of Illegal Drugs -- Cigarette traffickers will sometimes receive marijuana as payment for contraband cigarettes in lieu of currency, and then transport the marijuana back to North Carolina to sell for cash. Additionally, due to the strenuous driving patterns involved, cigarette traffickers will consume stimulants such as khat (a chewable leaf containing the Schedule I drug Cathinone) in order to stay awake.

d. Bulk United States Currency -- Because the sale of contraband cigarettes mostly occurs through a black market, payment is often in the form of cash. These cash proceeds are then available for traffickers to transport back to a source state to use for the purchase of additional cigarettes to smuggle. In the past when cigarette traffickers have been stopped by law enforcement, they have been found to be transporting cigarettes northbound and bulk U.S. currency (or occasionally marijuana) southbound.

e. Explanation of Bulk Currency -- Investigators have learned through prior investigations and other information that a common alibi for individuals engaged in cigarette trafficking who are stopped southbound with bulk U.S. currency is to claim the currency is for purchase of a business (such as a gas station or tobacco shop).

6. On May 13, 2022, at approximately 2:00 p.m., Deputy P. Hufton of the Nash County Sheriff's Office initiated a vehicle stop on a Chrysler Pacifica minivan (the "Pacifica") with Pennsylvania license plate LXV-0107. The Pacifica was traveling southbound on I-95 in Nash County, North Carolina. Deputy P. Hufton stopped the Pacifica for following too closely in violation of North Carolina General Statute 20-152. The speed limit on all relevant sections of I-95 is 70 miles per hour, and Deputy P. Hufton observed the Pacifica traveling less than three car lengths behind two different vehicles.

7. Based on his driver's license, the driver and sole occupant was identified as Fares ALBAHR (Hereinafter "ALBAHR") of 6871 Ames Rd., Apartment 913, Parma, OH. Deputy P. Hufton informed ALBAHR that ALBAHR was going to receive a written warning for the violation and, due to the location of the Pacifica off the roadway near an exit, asked ALBAHR to step out of the minivan while Deputy P. Hufton prepared the warning. ALBAHR agreed.

8. Upon ALBAHR exiting the vehicle, Deputy P. Hufton saw after-market sunshades on the back passenger windows of the Pacifica. Based on his training and experience, Deputy P. Hufton knew such sunshades were not typically provided by rental companies. The second and third rows of the Pacifica were also laid down, and there appeared to be one black sheet and multiple black trash bags laying on the floorboard in the passenger area.

9. While writing the warning, Deputy P. Hufton engaged in general conversation with ALBAHR about his trip. ALBAHR stated he was traveling to Jacksonville, North Carolina, where he might move. When asked about his plans in Jacksonville, ALBAHR mentioned he wanted to check out businesses, particularly convenience stores and gas stations. When asked about his current employment, ALBHAR first said that he drove full time for Uber, then said that he was in school and just graduated with his Master's degree from Cleveland University.

10. In discussing his travel, ALBAHR said he left Ohio at approximately 3:00 p.m. on May 11 and slept in Virginia overnight. ALBAHR could not recall in what city he stayed in Virginia or at which hotel, but said it may have been a "Motel 6." ALBAHR did not have a receipt.

11. At approximately 2:13 p.m., NCSO Deputy C. Williams arrived at the scene with a canine trained in narcotics. While Deputy P. Hufton waited on a read back of the year and model of the vehicle from communications, Deputy C. Williams deployed the canine to conduct an open-air sniff around the Pacifica. The canine alerted to the presence of narcotics at the passenger side window.

12. Meanwhile Deputy P. Hufton ran a query on the Pacifica in the License Plate Reader Network (LPRN), which allows law enforcement to view and locate where the vehicle has been seen and passed a license plate reader. The LPRN placed the vehicle in North Carolina on May 11 at 5:29 am, when ALBAHR stated that he was in Ohio. The LPRN also placed the vehicle in Delaware at 9:38 p.m., when ALBAHR stated he was traveling to North Carolina from Ohio. ALBAHR provided the rental agreement for the Pacifica to Deputy P. Hufton, which showed the vehicle was rented by ALBAHR on April 26, 2022 in East Elmhurst, New York; and had a return date of May 25, 2022 to the same location. Since April 26, 2022, the Pacifica had been clocked traveling through Delaware five times.

13. Deputy P. Hufton advised ALBAHR of the K-9 alert and that the officers would then search the vehicle. ALBAHR denied any illegal narcotics being in the vehicle, including Khat. ALBAHR admitted to having approximately $40,000.00 in bulk currency, which was

3

located inside multiple black plastic bags inside of a larger white plastic bag on the floorboard of the vehicle. A small amount of a substance believed to be Khat was also recovered from the glove box, despite ALBAHR'S denial.

14. During a subsequent interview with ALBAHR, during which time ALBAHR was advised that he was free to leave at any point, ALBAHR identified the bulk currency as loans from family and friends as follows:

      a.     $9,000.00 from an individual named "TAWFIK" in Ohio;

      b.     $11,000.00 from an individual named "FAWZI" in New York;

      c.     $7,000.00 from an individual named "ABRAHAM" in Ohio;

      d.     $14,000.00 from an individual named "ABRIHAM";

      e.     $4,000.00 from an individual named "ALI" in New York.

15. ALBAHR could not provide Deputy P. Hufton documentation to corroborate these loans or his employment as an Uber driver, nor could ALBAHR provide Deputy P. Hufton with any documentation regarding his plans to open a new business in North Carolina.

16. On July 27, 2022, a CAFRA form was submitted by ALBAHR petitioning the seizure of the U.S. Currency seized on May 13, 2022. ALBAHR included with his claim multiple affidavits from individuals who claimed to have loaned ALBAHR the subject U.S. Currency. The names and amounts in these affidavits did not match the information previously provided by ALBAHR during his interview with Deputy P. Hufton.

17. Based on the foregoing, probable cause exists to believe that the aforementioned $41,691.00 in United States Currency constitutes or is derived from proceeds traceable to specified unlawful activity, as defined by 18 U.S.C. § 1956(c)(7), including trafficking in contraband cigarettes in violation of 18 U.S.C. § 2342. The foregoing facts are therefore sufficient to support a reasonable belief that the $41,691.00 in United States Currency is forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

Respectfully submitted this 4th day of December 2023.

*Shelby E. Smith*
Shelby E. Smith
Task Force Officer
Department of Homeland Security